UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CATHERINE MARIE ANNIS,

        Plaintiff,

   v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____

18-CV-1276
DECISION & ORDER

On November 12, 2018, the plaintiff, Catherine Marie Annis, brought this action

under the Social Security Act ("the Act").  She seeks review of the determination by the

Commissioner of Social Security ("Commissioner") that she was not disabled.  Docket

Item 1.  On July 22, 2019, Annis moved for judgment on the pleadings, Docket Item 10;

on September 20, 2019, the Commissioner responded and cross-moved for judgment

on the pleadings, Docket Item 13; and on October 11, 2019, Annis replied, Docket Item

15.

For the reasons stated below, this Court grants Annis's motion in part and denies

the Commissioner's cross-motion.

## **BACKGROUND**

## I.    **PROCEDURAL HISTORY**

On March 28, 2012, Annis applied for Supplemental Security Income.  Docket

Item 7-6 at 2.  She claimed that she had been disabled since April 10, 2003, due to a

back injury, depression, fibromyalgia, asthma, high cholesterol, and "herniated bulging discs."[1]  *Id.* at 2, 5.

On June 29, 2012, Annis received notice that her application was denied because she was not disabled under the Act.  Docket Item 7-4 at 2.  She requested a hearing before an administrative law judge ("ALJ"), *id.* at 6, which was held on July 29, 2013, Docket Item 7-2 at 38-61.  The ALJ then issued a decision on November 18, 2013, confirming the finding that Annis was not disabled.  *Id.* at 21-33.  Annis appealed the ALJ's decision, but her appeal was denied on March 20, 2015, and the decision then became final.  *Id.* at 2.

On September 3, 2016, this Court (Geraci, *J.*) vacated the Commissioner's decision and remanded the matter for further proceedings so that the ALJ could "properly link the evidence to the physical, mental and functional demands of light work."  Docket Item 7-9 at 39-40, 42-43.  The ALJ held a second hearing on May 1, 2018, Docket Item 7-8 at 32-79, and again denied Annis's claim on August 3, 2018, *id.* at 5-24.[2]

---

[1] Annis later alleged additional impairments that began after she first applied for disability benefits.  *See* Docket Item 7-8 at 39.  Those impairments included esophageal reflux, migraines, sciatica, coronary artery disease, and thyroid disease.  *Id.*

[2] The Commissioner's regulations provide that "when a case is remanded by a [f]ederal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case," 20 C.F.R. § 416.1484(a); that the Appeals Council may assume jurisdiction of the case if the claimant files written exceptions to the ALJ's decision, or on the Council's own motion, *id.* §416.1484(c); and that "[i]f no exceptions are filed and the Appeals Council does not assume jurisdiction of your case, the decision of the administrative law judge becomes the final decision of the Commission after remand," *id.* § 416.1484(d).  Although the record provides no indication of what action, if any, the Appeals Council took with respect to the ALJ's August 3, 2018 decision, neither party claims that decision was not final.  This Court therefore assumes that "the Appeals Council did not assume jurisdiction," and so "the

## II.  RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Annis's claim. Annis was examined by several different providers, but the opinions of John Schwab, D.O.; Rajiv Jain, M.D.; Jeffrey Bova, D.C.; Nikita Dave, M.D.; John Kwock, M.D.; Renee Baskin, Ph.D.; P. Kudler, M.D.; Emilia Banse, F.P.M.H.N.P.; Angela J. Roche, P.M.H.N.P.; Richard Bennett, M.D.; and David Schaich, Psy.D., are of most significance to the claim of disability here.

### A.  Physical Functioning Evidence

### 1.  John Schwab, D.O.

On June 19, 2012, Dr. Schwab, a family medicine doctor, completed a consultative internal medicine examination for the Social Security Administration ("SSA").  Docket Item 7-7 at 210-13.  He diagnosed depression, asthma, back pain, and tobacco abuse; he recommended that Annis "avoid activity that triggers her asthma"; and he opined that she had "mild restriction[s] [in] bending, lifting, and carrying."  *Id.* at 212-13.

### 2.  Rajiv Jain, M.D.

On April 14, 2018, Dr. Jain, an internist, completed a physical residual functional capacity questionnaire for the SSA.  Docket Item 7-14 at 97-101.  Dr. Jain stated that he had treated Annis every six months or so for thirteen years.  *Id.* at 97.  He diagnosed asthma, anxiety, myalgia, sleep disorder, and lower back pain.  He opined that Annis's

---

ALJ's decision became the Commissioner's final decision and is thus subject to judicial review."  *See Frame v. Comm'r of Soc. Sec. Admin.*, 596 Fed. App'x 908, 909 (11th Cir. 2015) (per curiam).

impairments could be expected to last at least twelve months. *Id.* But Dr. Jain did not opine as to Annis's specific physical limitations because he believed that she first needed a "functional capacity eval[uation]" before he could "answer [the] specific questions [on the questionnaire]." *Id.* at 98-100.

Dr. Jain had previously evaluated Annis and assessed the following "percentage[s] (0-100%) of temporary impairment": 100% on January 20, 2014, Docket Item 7-13 at 13; 25% on May 1, 2014, *id.* at 256; 50% on October 2, 2014, *id.* at 270; 75% on October 12, 2017, Docket Item 7-14 at 44; and 75% on January 15, 2018, *id.*at 16.

### 3. Jeffrey Bova, D.C.

From March 13, 2007, through at least March 12, 2018, Annis received weekly to monthly treatment from Dr. Bova, a licensed chiropractor. *See* Docket Item 7-7 at 96; Docket Item 7-14 at 82-88.

On January 20, 2014, Dr. Bova opined that Annis was "100% disabled and [was] unable to work." Docket Item 7-13 at 3. About two months later, on March 12, 2014, Dr. Bova completed a spine residual functional capacity questionnaire for the SSA. *Id.* at 16-19. He noted that he had treated Annis once to twice per month, and he diagnosed subluxation and fixation of the lumbar spine with a herniated disc, intervertebral disc syndrome, radicular neuritis, and degenerative disc disease. *Id.* at 16. Dr. Bova opined that Annis's symptoms would frequently interfere with her attention and concentration. *Id.* at 17. He further opined that she could walk less than one city block without rest or severe pain; could sit or stand for only 15-20 minutes at a time; could sit or stand for a combined total of less than 2 hours in a day; needed to walk for

15 minutes every 15-20 minutes; could rarely lift 10-20 pounds and never more than 20; and could rarely twist, stoop, crouch/squat, or climb ladders or stairs. *Id.* at 17-18. He concluded that as a result of her impairments, Annis would be absent from work more than four days per month and was not capable of sustaining full-time work. *Id.* at 18.

On March 5, 2018, Dr. Bova opined that Annis was "[a]ble to return to work/school with the following restrictions": "[u]nable to climb[ ] stairs repetitively . . . [u]ntil further notice." Docket Item 7-14 at 79. He noted that Annis "continue[d] to have . . . relief with treatment" and that her "[p]rognosis [was] fair to good with compliance of treatment plan." *Id.* at 87.

### 4. Nikita Dave, M.D.

On November 2, 2017, Dr. Dave, a physiatrist, completed a consultative internal medicine evaluation for the SSA. Docket Item 7-13 at 430-34. She diagnosed anxiety, panic, and depression; a torn right meniscus; chronic obstructive pulmonary disease ("COPD"); dyslipidemia; and low back pain with left lower limb numbness. *Id.* at 433. Dr. Dave opined that, due to her COPD, Annis should avoid "smoke, dust, fumes, inhalants, chemicals, extremes of temperature, humidity, and severe physical exertion." *Id.* She also found that, due to her right knee pain and left leak weakness, Annis should "[a]void ladders and heights" and "may [have] mild-to-moderate limitations" in "repetitive kneeling, crawling, and crouching"; "prolonged sitting, standing, [and] walking"; and "repetitive bending [and] twisting to the lumbar spine." *Id.* Finally, Dr. Dave opined that Annis had "moderate [limitations]" in "lifting, carrying, pushing, and pulling." *Id.*

### 5. John Kwock, M.D.

On May 1, 2018, Dr. Kwock, an orthopedic surgeon who had examined Annis's records but never examined her, testified at the administrative hearing regarding Annis's physical functional limitations. *See* Docket Item 7-8 at 45-52. He diagnosed minor degenerative joint disease of the cervical and lumbar spine, internal derangement of the right knee, and morbid obesity. *Id.* at 45-46 (citing Docket Item 7-13 at 360, 363 (2014 and 2015 cervical spine X-rays); Docket Item 7-7 at 214 and Docket Item 7-13 at 362 (lumbar spine X-rays); Docket Item 7-7 at 245 and Docket Item 7-13 at 374, 395 (right knee radiological studies); Docket Item 7-13 at 390 (right knee arthroscopy report); Docket Item 7-7 at 245 (left knee X-ray); Docket Item 7-7 at 117, 151, 211, 308, Docket Item 7-13 at 12, 285, 339, 431, and Docket Item 7-14 at 15 (physical examinations)). He declined to opine as to whether Annis had coronary artery disease, COPD, asthma, esophageal reflux, migraines, or thyroid disease because, as an orthopedic surgeon, he lacked the "expertise" to do so. *Id.* at 45-46. But he did find that no evidence in the record supported a diagnosis of fibromyalgia. *Id.* at 45.

Dr. Kwock concluded that Annis's impairments did not meet Listing 1.04 (disorders of the spine) because there was no evidence of "nerve root impingement in either the upper extremities or lower extremity [sic]." *Id.* at 47. Nor did her impairments "come close to meeting" Listing 1.02 (major dysfunction of a joint) because her arthroscopic debridement resolved her symptoms and "there [was] no other evidence of any other pathology." *Id.* at 47-48.

But Dr. Kwock did find that Annis had certain work-related limitations. He opined that she could work at a "medium work exertional level"—that is, she could "lift and carry up to 10 pounds on a continuous basis, between 11 and 20 pounds on a frequent basis,

between 21 and 50 pounds occasionally, [but never] anything above 51 pounds"; she could "sit for eight hours out of eight"; and she could "stand and walk for eight hours out of eight." *Id.* at 48. He opined that she could continuously kneel and balance; frequently stoop, crouch, or climb stairs, ramps, ladders, and scaffolds; and occasionally crawl. *Id.* Finally, Dr. Kwock found that Annis had no limitations in the use of her upper extremities. *Id.*

## B.  Mental Functioning Evidence

### 1.  Renee Baskin, Ph.D.

On June 19, 2012, Dr. Baskin, a psychologist, completed a consultative psychological examination for the SSA. Docket Item 7-7 at 206-09. Dr. Baskin diagnosed dysthymic disorder, "pain disorder associated with general medical condition," back pain, high cholesterol, and asthma. *Id.* at 208-09. And she opined that Annis "should have minimal to no limitations being able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks with supervision, make appropriate decisions, relate adequately with others and appropriately deal with stress." *Id.* Dr. Baskin concluded that Annis's psychiatric problems "[did] not appear to be significant enough to interfere with [her] ability to function on a daily basis." *Id.* at 208.

### 2.  P. Kudler, M.D.

On June 28, 2012, Dr. Kudler, a psychiatrist, reviewed the evidence of record—in particular, Dr. Baskin's consultative examination—and completed a disability determination for the SSA. *Id.* at 215-28. Dr. Kudler found that Annis had two medically

determinable mental impairments: dysthymic disorder and pain disorder.  *Id.* at 218,

221.  Dr. Kudler opined that Annis was mildly limited in the functional area of

maintaining social functioning; had no limitations in the areas of activities of daily living

and maintaining concentration, persistence, or pace; and had never experienced

episodes of mental deterioration.  *Id.* at 225.

### 3. Suburban Psychiatric Associates: Emilia Banse, F.P.M.H.N.P., Angela J. Roche, P.M.H.N.P., and Richard Bennett, M.D.

On December 4, 2013, Annis began psychiatric care at Suburban Psychiatric

Associates.  Docket Item 7-13 at 41.  She received bimonthly medication management

from three different providers: Nurse Practiioner ("NP") Banse, a family psychiatric

mental health nurse practitioner; NP Roche, a psychiatric mental health nurse

practitioner; and Dr. Bennett, a psychiatrist.  Specifically, from December 4, 2013,

through November 6, 2014, NP Banse treated Annis, *see id.* at 41-61; from December

12, 2014, to June 17, 2017, NP Roche treated Annis, *see id.* at 63-109; and from July

20, 2016, through March 28, 2018, Dr. Bennett treated Annis, *see id.* at 110-19; Docket

Item 7-14 at 91-95.

Throughout this five-year period, NP Banse, NP Roche, and Dr. Bennett

diagnosed major depressive disorder (recurrent, moderate) and generalized anxiety

disorder, prescribed antidepressant and anti-anxiety medications, and recommended

that Annis start therapy.  *See, e.g.*, Docket Item 7-13 at 42-43.  They also found that

Annis was "consistently" depressed but did not display mania or suicidality; had "clear

and appropriate" speech; had "normal" thought processes "without dementia or overt

illogical thinking"; displayed no "delusions, hallucinations, obsessions, preoccupations

or somatic thoughts"; displayed "normal" attention and concentration; and was alert and

oriented with "intact" memory, judgment, and insight    *Id.* at 42; *see also id.* at 45, 48, 51, 55, 59, 64, 68, 72, 76, 80, 84, 88, 92, 96, 100, 104, 108, 110, 112, 114, 116, 118. Annis refused psychotherapy.  *See, e.g.*, *id.* at 43.

On March 28, 2018, Dr. Bennett completed a medical source statement about Annis's mental functioning.  Docket Item 7-14 at 91-95.  He opined that her symptoms precluded her from performing a variety of skills under the umbrellas of understanding and memory, social interaction, and adaptation.  *Id.* at 93-94.  Specifically, for 11-20% of an 8-hour workday, Annis could not perform six of the twelve understanding and memory skills, two of the four social interaction skills, and two of the five adaptation skills; and for at least 20% of the workday, she could not perform any of the remaining skills in those three areas.  *Id.* at 93-94.  Dr. Bennett further found that Annis's impairments would cause her to be "off task" at work for more than 30% of an 8-hour workday and to miss than four workdays per month.  *Id.* at 94-95.

### 4. David Schaich, Psy.D.

On November 2, 2017, Dr. Schaich, a psychologist, completed a consultative psychological examination for the SSA.  Docket Item 7-13 at 443-47.  Dr. Schaich diagnosed major depressive disorder (recurrent, moderate), panic disorder, and an unspecified anxiety disorder.  *Id.* at 446.  He opined that Annis had "[n]o limitation[s]" in her "ability to understand, remember, or apply simple . . . [or] complex directions and instructions."  *Id.*  But she was mildly limited in her ability to "use reason and judgment to make work-related decisions"; "interact adequately with supervisors, coworkers, and the public"; "sustain concentration and perform a task at a consistent pace"; "sustain an ordinary routine and regular attendance at work"; and "regulate emotions, control

behavior, and maintain well being." *Id.* Dr. Schaich concluded that Annis's psychiatric problems "[did] not appear significant enough to interfere with [her] ability to function on a daily basis." *Id.* at 446.

## III.    THE ALJ'S DECISION

In denying Annis's application, the ALJ evaluated Annis's claim under the SSA's five-step evaluation process for disability determinations. *See* 20 C.F.R § 416.920(a)(2). At the first step, the ALJ determines whether the claimant currently is engaged in substantial gainful employment. § 416.920(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. § 416.920(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. § 416.920(a)(4)(i). If there are no severe impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. § 416.920(a)(4).

At step three, the ALJ determines whether any severe impairment or combination of impairments meets or equals an impairment listed in the regulations. § 416.920(a)(4)(iii). If the claimant's severe impairment or combination of impairments meets or equals one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that no severe impairment or combination of impairments meets or equals any in the regulations, the ALJ proceeds to step four. § 416.920(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 416.920(a)(4)(iv); 416.920(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and non-severe medical

impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See* § 416.945

After determining the claimant's RFC, the ALJ completes step four. § 416.920(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. § 416.920(f). But if the claimant cannot, the ALJ proceeds to step five. §§ 416.920(a)(4)(iv); 416.920(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 416.920(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ found at step one that Annis had not engaged in substantial gainful activity since the date she applied for disability benefits. Docket Item 7-8 at 7. At step two, the ALJ found that Annis had "the following severe impairments: "obesity[;] asthma/emphysema[;] history of later-onset torn meniscus, with repair and re-tear; depressive disorder[;] degenerative disc disease of the lumbar and cervical spine[;] and [COPD]." *Id.* The ALJ found that Annis's coronary artery disease and hypothroidism were "not severe" and that her fibromyalgia did not qualify as a "medically determinable impairment." *Id.* at 8.

At step three, the ALJ determined that Annis did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* More specifically, the ALJ found that Annis's degenerative disc disease did not meet Listing 1.04 (disorders of the spine); her knee impairments did not meet Listing 1.02 (major dysfunction of a joint); her asthma did not meet Listing 3.03 (asthma); and her COPD did not meet Listing 3.02 (chronic respiratory disorders). *Id.* at 8-9. The ALJ also found that Annis's mental impairments did not meet Listing 12.04 (depressive, bipolar, and related disorders) because Annis did not have at least two marked limitations or one extreme limitation in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing herself. *Id.* at 9-10.

The ALJ then found that Annis had the following RFC:

> [Annis could] perform light work[3] . . . . [She] can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. She can sit for 2/3 of an eight-hour day (frequently), and stand or walk [for] 1/3 of an eight-hour day (occasionally). She can occasionally climb stairs and ramps but can never climb ladders, ropes or ladders [sic]. [She] can occasionally kneel, crouch, and crawl. She must avoid all exposure to excessive cold, excessive heat, and excessive moisture/humidity. She must avoid concentrated exposure to pulmonary irritants, such as odors, fumes, dusts, gasses and poor ventilation. [She] must avoid excessive vibration and exposure to hazards such as unprotected heights and moving machinery. She is limited to simple, routine tasks that can be learned after a short demonstration or within 30 days, and work allowing her to be off task 5% of the workday, in addition to regularly scheduled breaks. She can have occasional interaction

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

with the public and coworkers. She can perform work that does not require teamwork, such as on a production line.

*Id.* at 10-11. The ALJ explained that although "[Annis]'s medically determinable impairments could reasonably be expected to cause [her] alleged symptoms[,] . . . [Annis]'s statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 12 . In reaching this determination, the ALJ gave "great weight" to the opinion of the testifying medical expert, Dr. Kwock, and "some weight" to the June 2012 opinion of the consulting physician, Dr. Schwab; the April 2018 opinion of Annis's treating physician, Dr. Jain; and the November 2017 opinion of the consulting psychologist, Dr. Schaich. *Id.* at 13-20. He gave "little weight" to the January 2014, March 2014, and March 2018 opinions of Annis's treating chiropractor, Dr. Bova; the November 2017 opinion of the consulting physician, Dr. Dave; and the March 2018 opinion of Annis's treating psychologist, Dr. Bennett.[4] *Id.* at 16-22.

At step four, the ALJ found that Annis had no past relevant work. *Id.* at 22. And at step five, the ALJ found that "[c]onsidering [Annis's] age, education, work experience, and [RFC], there [were] jobs that exist[ed] in significant numbers in the national economy that [Annis] could perform." *Id.* at 22. Specifically, the ALJ credited the

---

[4] The ALJ discussed the June 2012 opinion of the consulting psychologist, Dr. Baskin, but did not give that opinion any specific weight. *See id.* at 18. Instead, the ALJ found that although Dr. Baskin opined that Annis would have minimal-to-no limitations in mental functioning, that opinion was inconsistent with "subsequent medical evidence, as well as [Annis's own] allegations." *Id.* For the same reason, the ALJ gave "some weight" to the June 2012 opinion of the non-examining psychiatric consultant, P. Kudler, who "relied on [Dr. Baskin's] examination." *Id.*

testimony of a vocational expert that Annis could find work as a small product assembler, electronic assembler, or plastic molding worker.  *Id.* at 22-23.

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry."  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination."  *Id.*  This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'"  *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)).  "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles."  *Johnson*, 817 F.2d at 986.

## I.    ALLEGATIONS

Annis argues that the ALJ erred in two ways. Docket Item 10-1 at 25-35. First, she argues that he did not comply with the procedural mandates of the treating-physician rule. *Id.* at 26-31. Second, she argues that the ALJ's RFC determination is not otherwise supported by substantial evidence in the record and, instead, is the product of the ALJ's "lay judgment." *Id.* at 31-35. In light of these errors, she argues, this Court again should remand the matter for reconsideration of her eligibility for benefits. *Id.* at 35.

## II.    ANALYSIS

### A.    Treating-Physician Rule

Annis first argues that the ALJ erred procedurally by violating the treating-physician rule. *Id.* at 26-31. This Court agrees.

When determining a claimant's RFC, an ALJ must evaluate every medical opinion received. 20 C.F.R. § 416.927(c). But an ALJ generally should give greater weight to the medical opinions of treating sources—physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists who have "ongoing treatment relationship[s]" with the claimant—because those medical professionals are in the best positions to provide "detailed, longitudinal picture[s] of [the claimant's] medical impairments." *See* 20 C.F.R. § 404.1527(a)(2), (c)(2); *see also Genier v. Astrue*, 298 Fed. App'x 105, 108 (2d Cir. 2008) (summary order). In fact, a treating physician's opinion is entitled to controlling weight so long as it is "well-supported [sic] by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2).

Before an ALJ may give less-than-controlling weight to a treating source's opinion, the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and[ ] (4) whether the physician is a specialist." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quotations and alterations omitted). These are the so-called "*Burgess* factors" from *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight" to a treating source opinion "is a procedural error." *Id.* at 96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

Here, the ALJ accorded "little weight" to the opinion of Annis's treating psychiatrist, Dr. Bennett, that Annis could not perform many basic skills for a substantial part of an 8-hour workday; would be "off task" for more than 30% of an 8-hour workday; and would miss more than four workdays per month. Docket Item 7-14 at 93--95. The ALJ asserted that this opinion was "wholly inconsistent with other mental health opinions in the medical evidence of record, including self-reports indicating only minor depression." Docket Item 7-8 at 21 (citing Docket Item 7-14 at 30-31, 32, 69, 71). He also found that it was "inconsistent with [Dr. Bennett's] own office notes, which consistently indicate[d] that [Annis's] thought processes were clear and appropriate; she was alert and oriented; her memory remained intact and her attention span and concentration were fair," as well as the "the relatively high [Global Assessment of

Functioning] scores ranging from 70 to 80 provided by Dr. Bennett." *Id.* (citing Docket Item 7-13 at 40-119).

The ALJ instead rested his mental RFC determination on the November 2, 2017 opinion of the consulting psychologist, Dr. Schaich, that Annis had "[n]o limitation[s]" in her "ability to understand, remember, or apply simple . . . [or] complex directions and instructions" and was only mildly limited in her ability to "use reason and judgment to make work-related decisions"; "interact adequately with supervisors, coworkers, and the public"; "sustain concentration and perform a task at a consistent pace"; "sustain an ordinary routine and regular attendance at work"; and "regulate emotions, control behavior, and maintain well being." Docket Item 7-13 at 446. And the RFC reflected the weights assigned to the opinions of Dr. Bennett and Dr. Schaich. *See* Docket Item 7-8 at 10-11 ("[Annis] is limited to simple, routine tasks that can be learned after a short demonstration or within 30 days, and work allowing her to be off task 5% of the workday, in addition to regularly scheduled breaks. She can have occasional interaction with the public and coworkers. She can perform work that does not require teamwork, such as on a production line.").

But in assigning those weights, the ALJ did not comply with the procedural mandates of the treating-physician rule. In particular, the ALJ did not "explicitly" consider the first *Burgess* factor: Dr. Bennett had treated Annis for nearly two years (indeed, his office had treated her for nearly five years) and therefore likely had "a detailed, longitudinal picture of [Annis's] medical impairments," *see* 20 C.F.R. § 404.1527(a)(2), (c)(2). When discussing Annis's hearing testimony, the ALJ made passing reference to the fact that Annis "has been seeing Dr. Bennett every two months

for the past three years." *See* Docket Item 7-8 at 11-12. But the ALJ never indicated

that such a treatment history played any role in his later evaluation of Dr. Bennett's

opinion. Nor did the ALJ "explicitly" consider the fourth *Burgess* factor: Dr. Bennett is a

psychiatrist, whose opinion regarding Annis's mental functioning therefore might be

accorded greater weight than that of a generalist. In fact, Dr. Bennett's specialty is not

mentioned anywhere in the ALJ's decision.

"Because the ALJ procedurally erred, the question becomes whether 'a

searching review of the record assures [this Court] that the substance of the [treating-

physician] rule was not traversed'—*i.e.*, whether the record otherwise provides 'good

reasons' for assigning 'little weight'" to some of Dr. Bennett's opinions. *See Estrella*,

925 F.3d at 96 (alterations omitted) (quoting *Halloran*, 362 F.3d at 32); *see also Zabala*

*v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining remand where "application of the

correct legal principles to the record could lead [only to the same] conclusion"). The

Court finds no such assurance here.

The ALJ determined that Annis could perform "simple, routine tasks that can be

learned after a short demonstration or within 30 days, and work allowing her to be off

task 5% of the workday, in addition to regularly scheduled breaks. She can have

occasional interaction with the public and coworkers." Docket Item 7-8 at 10-11. In

contrast, Dr. Bennett concluded that Annis's impairments would cause her to be "off

task" more than 30% of an 8-hour workday and to miss more than four workdays per

month. Docket Item 7-14 at 94-95. He also found that she was limited in her ability to

remember work-like procedures; understand, remember, and carry out simple

instructions; maintain attention for two-hour segments; sustain an ordinary routine

without special supervision; and perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.* at 93.  More specifically, he found that Annis's impairments "[p]reclude[d]" her from performing these skills for periods ranging from 11-20% to more than 20% of an 8-hour work day.  *Id.*  So the ALJ rejected Dr. Bennett's professional findings and agreed with the consulting psychologist, Dr. Schaich, that Annis was only mildly limited in the mental functioning domains.  Docket Item 7-13 at 446.

The ALJ's determination is not supported by "good reasons" in several ways. First, in rejecting Dr. Bennett's professional opinion, the ALJ substituted his own lay opinion for that of a medical expert.  The ALJ asserted that Dr. Bennett's opinion was "inconsistent with [Dr. Bennett's] own office notes, which consistently indicate[d] that [Annis's] thought processes were clear and appropriate; she was alert and oriented; her memory remained intact and her attention span and concentration were fair."  Docket Item 7-8 at 21.  But Dr. Bennett explicitly acknowledged some of those same findings at the beginning of his questionnaire—prior to rendering the opinion at issue.  *See* Docket Item 7-14 at 91 (listing the following as "clinical findings . . . that demonstrate the severity of [Annis's] mental impairment and symptoms": "fair eye contact, attention span and concentration are fair, displays depression[, and] speech is spontaneous").  In other words, notwithstanding these potentially benign clinical findings, Dr. Bennett concluded that Annis was functionally limited in significant ways.  In concluding otherwise, the ALJ "arbitrarily substitute[d] his own judgment for competent medical opinion."  *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).  "[A]s a lay person, the ALJ simply was not in a position to know whether" certain clinical observations "would in fact preclude the

disabling [limitations] described by [Dr. Bennett] in [his] assessment." *See Rosa*, 168 F.3d at 79 (original alterations omitted).[5]

This Court also is not persuaded that the opinion of Dr. Schaich, formed after a single examination, otherwise supports the ALJ's determination that Annis's impairments did not substantially impair her performance in a variety of functional areas. The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," a "concern [that] is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health." *Estrella*, 925 F.3d at 98 (first quoting *Selian*, 708 F.3d at 419); *see also id.* at 97 (explaining that because "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, . . . it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is [not disabled]" (second alteration in original) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)). Relying on Dr. Schaich's opinion at the expense of Dr. Bennett's highlights that very concern.

---

[5] *See also Balsamo*, 142 F.3d at 81 ("In the absence of a medical opinion to support [an] ALJ's finding as to [a claimant's] ability to perform [a certain level of] work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." (citation and original alterations omitted)); *Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000) ("[W]hile a physician's opinion might contain inconsistencies and be subject to attack, 'a circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion.'" (quoting *Wagner v. Sec. of Health & Human Servs.,* 906 F.2d 856, 862 (2d Cir. 1990))).

What is more, there are no "good reasons" in the record supporting the ALJ's specific mental RFC determination that Annis would be off task for no more than "5% of the workday." Docket Item 7-8 at 10-11. Specific RFC assessments must be based on evidence in the record, not on an "ALJ's own surmise." *Cosnyka v. Colvin*, 576 Fed. App'x 43, 46 (2d Cir. 2014) (summary order) (remanding where ALJ "translated" medical evidence suggesting that the claimant would be off task "for ten percent of the workday" into a determination that the claimant would be off task "six minutes out of every hour" because "[t]here [was] no evidence in the record to the effect that [the claimant] would be able to perform sedentary work if he could take a six-minute break every hour, rather than some other duration and frequency amounting to ten percent of the workday").[6] Without "some explanation" from the ALJ "as to the tether between [the] RFC and the non-stale medical opinions or statements from [the claimant], the RFC [is] based upon [the ALJ's] lay analysis of [the claimant's] limitations, which is not permitted and requires remand." *Jordan v. Berryhill*, 2018 WL 5993366, at *3 (W.D.N.Y. Nov. 15, 2018)).

---

[6] *See also Tomicki v. Berryhill*, 2018 WL 703118, at *5 (W.D.N.Y. Jan. 11, 2018) ("[T]he record does not support the ALJ's conclusion that [the claimant] need[ed] to briefly switch between sitting and standing only every thirty minutes. . . . Moreover, there is evidence in the record indicating that [the claimant] need[ed] to change positions every few minutes, not every thirty minutes."); *cf., e.g.*, *Palistrant v. Comm'r of Soc. Sec.*, 2018 WL 4681622, at *5 (W.D.N.Y. Sep. 28, 2018) (holding that the claimant's testimony that he had to alternate between sitting and standing every 20-30 minutes as well as general treatment notes about sitting and standing limitations supported RFC determination that the claimant could alternate between sitting and standing every half hour); *Bryant v. Berryhill*, 2017 WL 2334890, at *4 (W.D.N.Y. May 30, 2017) (holding that "several refences in the record," including the claimant's conflicting reports about the length of time he could sit or stand—some indicating 10 to 15 minutes at a time and others indicating 30 minutes at a time—permitted the ALJ to "reasonably conclude[ ] that [the claimant] could sit for 30 minutes and stand for 15 minutes").

Here, no medical opinion supports the ALJ's 5% off-task determination.  Dr.

Bennett opined that Annis would be off task for at least 30% of the workday.  *See*

Docket Item 7-14 at 94.  No other treatment records indicate a specific time limitation.

For his part, Dr. Schaich opined that Annis was "mildly limited" in her ability to "sustain

concentration and perform a task at a consistent pace" but offered no specific limitation.

Docket Item 7-13 at 446; *see also* Docket Item 7-7 at 206 (consulting psychologist, Dr.

Baskin, opining in 2012—without further elaboration—that Annis had "minimal-to-no

limitations" in these areas); *id.* at 215 (non-examining, consulting psychiatrist, Dr.

Kudler, opining in 2012—without further elaboration—that Annis was not limited in these

areas).  Only the ALJ imposed specific time frames on Annis's ability to stay on task.

At best, then, the ALJ's conclusion comes from whole cloth.  At worst, the

conclusion responds to the vocational expert's testimony that an off-task behavior

restriction of 20%—that is, an off-task rate even lower than that found by Dr. Bennett—

"would degrade the individual's productivity to unacceptable levels."  Docket Item 7-8 at

774.  If Annis can, in fact, be on task for 95% of the workday, that determination must

come from medical evidence or opinions in the record, not the ALJ's "own surmise."

*See Cosnyka*, 576 Fed. App'x at 46.  So if the ALJ wishes to address the time that

Annis can stay on task, he should adopt Dr. Bennett's findings or obtain another

physician's opinion on the matter.

For all these reasons, the case is remanded so that the ALJ can reconsider

Annis's specific RFC limits after appropriately applying the treating-physician rule to the

opinion of Dr. Bennett.  This Court "will not reach the remaining issues raised by [Annis]

because they may be affected by the ALJ's treatment of this case on remand."  *Watkins*

*v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003); *see also Bonet ex rel. T.B. v. Colvin*, No. 1:13-CV-924, 2015 WL 729707, at \*7 (N.D.N.Y. Feb. 18, 2015) ("Given the need to apply the proper legal standard, the Court will decline at this time to consider whether substantial evidence exists to support the findings the ALJ made.").

### III.    TIME LIMIT

Annis asks this Court to order that the Commissioner issue a new determination within a certain time frame.  Docket Item 10-1 at 35-36.  Although the Second Circuit has instructed that district courts may, in appropriate circumstances, set a time limit for reconsideration of a claim, *see, e.g.*, *Butts v. Barnhart,* 416 F.3d 101 (2d Cir. 2005), that remedy is not appropriate here.  In *Butts*, the Second Circuit found a 120-day time limit appropriate where the district court was "reviewing an ALJ's decision at step five, rather than step four, of the five-step inquiry."  416 F.3d at 103.  In so holding, the court emphasized that "the evidence at the fifth stage would compel a finding that [the plaintiff] was disabled *absent the Commissioner's meeting her burden* of making a contrary showing" and cautioned that its "holding [was] limited to [such] cases where the claimant [was] entitled to benefits absent the Commissioner's" meeting her burden of rebuttal.  *Id.* at 104 (emphasis added); *Michaels v. Colvin*, 621 Fed. App'x 35, 41 (2d Cir. 2015) (summary order) (imposing 120-day limit for step five remand because the claimant had first applied for benefits more than eight years prior).

Here, the ALJ must reconsider Annis's RFC at step four.  Although the ALJ made a step-five determination, he did so because Annis had no past relevant work—not because Annis had met her burden of establishing that she was disabled through evidence that she could not perform past relevant work.  *Cf. Butts v. Barnhart*, 388 F.3d

377, 383 (2d Cir. 2004), *amended on reh'g in part,* 416 F.3d 101 (2d Cir. 2005) ("The claimant bears the burden of proving his or her case at steps one through four . . . . At step five the burden shifts to the Commissioner.").  In other words, unlike in *Butts* and *Michaels*, Annis has not yet demonstrated that she is disabled.  Therefore, although this Court is sympathetic to the hardships that must result from Annis's pursuit of benefits for nearly eight years, it denies her request to impose a time limit for further administrative proceedings.  Nevertheless, this Court "expects," especially in light of the delay that Annis has experienced because this case already has been remanded once due to the Commissioner's errors, "that administrative proceedings on remand [will] proceed expeditiously."  *See Belen v. Colvin*, 2016 WL 1048058, at *4 (S.D.N.Y. Mar. 11, 2016).

**<u>CONCLUSION</u>**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 13, is DENIED, and Annis's motion for judgment on the pleadings, Docket Item 10, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated:     December 17, 2019
           Buffalo, New York

                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE